PEOPLE v. DOLAN.

(Supreme Court, Appellate Division, First Department. March 9, 1906.)

1. FORGERY—UTTERING FORGED NOTE—EVIDENCE—ADMISSIBILITY.

In a prosecution for uttering a forged note by indorsing it to a bank and procuring it to be discounted, defendant testified that he knew nothing of the forgery or that the note had been made by any other person than the one whose name was signed to it until the time the note became due. *Held*, that further testimony with respect to what defendant had learned in regard to the note and its execution when it became due, and as to whether a third person had then told him that she had signed the forged name to the note, was admissible.

2. CRIMINAL LAW—EVIDENCE—OTHER OFFENSES.

In a prosecution for uttering a forged note by indorsing it to a bank, evidence as to the forging and uttering of other notes by defendant which were not negotiated with such bank, but with other banks and individuals, all of which notes were paid when due, and most of which were subsequent to the discount of the note on which the prosecution was based, was not admissible to show defendant's knowledge that the note in question was forged.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, §§ 825–829.]

Ingraham and McLaughlin, JJ., dissenting.

Appeal from Court of General Sessions, New York County.

James F. Dolan was convicted of forgery, and appeals. Reversed.

Argued before O'BRIEN, P. J., and McLAUGHLIN, INGRAHAM, LAUGHLIN, and HOUGHTON, JJ.

Alfred R. Page, for appellant.

Robert C. Taylor, for the People.

HOUGHTON, J. The facts are fully stated in the opinion of Mr. Justice Ingraham, and further statement is unnecessary. I think the judgment of conviction should be reversed, because of errors committed upon the trial.

The charge that the defendant forged the note in question was withdrawn, and he was tried for the crime of uttering it. This issue, of course, involved his knowledge that the note was forged when he procured its discount at the bank. The only proof that the note was forged was by Cockerill that he did not sign it. Miss Fitzpatrick had general charge of defendant's office, and took the note in question to the bank with the money to pay the discount, informing the bank that the defendant would call later and indorse it. The cashier of the bank testified that the defendant called that same day and indorsed this note with others. The defendant says that he was not in the city on that day, and produces evidence of other witnesses to corroborate him in that respect, and that he called several days later and made the indorsements. All these circumstances with respect to delivery of the note to the bank and the indorsement of it by the defendant show good reason for the people abandoning the charge of forgery made against the defendant, and confining the issue to that of uttering a forged instrument. Whatever was communicated to the defendant by any person with respect to the validity of the note, and as to whether or not it was in fact made by Cockerill, or by his authority, or that it was a valid instrument, or that it was a genuine note and not forged, was, of course, most pertinent upon the question of defendant's knowledge that it was a forged instrument and upon his intent in uttering it.

While the defendant was testifying in his own behalf, certain questions were asked him with respect to what he had learned in regard to the note, and its execution when it had become due, and at the time its validity was called in question, and what Miss Fitzpatrick told him in respect to it, and whether or not she told him that she herself had signed "Cockerill & Son" to the note. The defendant had already testified that he knew nothing of the forgery of the note, or that it had been made by Miss Fitzpatrick, or any other person aside from Cocker-

ill at the time it was delivered to the bank, or when he indorsed it, and had no such knowledge until its validity was questioned on its presentation for payment. If he then for the first time learned that the note was in fact a forgery, he certainly had a right to prove that fact, for it tended to prove that at the time he uttered the note he had no knowledge that it was forged, and therefore no intent to defraud the bank by uttering it. He was not confined to the bare statement that he then learned the fact for the first time, but could prove how that knowledge came to him. It seems to me to be evading the question to say that such evidence would be competent if it related to the time of his indorsement and uttering of the notes, but incompetent because the knowledge was acquird at a subsequent time. The contrary follows; for if he had been informed by Miss Fitzpatrick, before he indorsed and uttered the note, that she had forged it, then he had knowledge of its forgery, and was proving himself guilty of the crime of which he was charged. The questions propounded, answers to which were excluded by the court, were not as sharp and pointed as they might have been; but I think the testimony sought to be elicited tended to prove that at the time the irregularity of the note was discovered the defendant then entered upon an inquiry as to how it came to be made and who forged it. He had a right to show to the jury that then was the time he first learned that the note was forged. If the jury believed his story in this respect, then, of course, he was not guilty of the crime for which he was being tried, because he did not utter the forged paper knowing at the time he uttered it that it was forged. His knowledge and intent was the only issue to be considered, because the people had abandoned the charge that the note was forged by him. On this issue the defendant had the right to prove any facts pertinent to the questions involved, and which tended to put an innocent aspect upon his own acts. Donohue v. The People, 56 N. Y. 208, 213; People v. Gardner, 144 N. Y. 119, 131, 38 N. E. 1003, 28 L. R. A. 699, 43 Am. St. Rep. 741.

I am also inclined to the opinion that the people were permitted to go too far in proving the forging and uttering of other notes in addition to the series of Cockerill notes. These were notes negotiated, not with the bank which discounted the Cockerill note, but with other banks and individuals, and which were all paid in due course. The most of them, if not all, were subsequent to the discount of the original Cockerill note on the 13th of May, 1897. They, therefore, had no bearing with respect to the financial embarrassment of the defendant which would induce him to forge or utter the Cockerill note to obtain funds to redeem any other forged paper. It was competent to show that the original Cockerill note was forged, and that it was renewed with forged paper. The other notes, however, were mere bald independent forgeries, if forgeries at all. Besides, proof as to the forgery of many of them was permitted without producing the note at all. I am aware that the issue of knowledge that an instrument is forged, and intent to defraud in uttering it, is a very broad one, and that many crimes might go unpunished if the people were not permitted to prove that a person charged with a particular crime was engaged in a general scheme to defraud by similar means. In the present case, however, the simple issue was whether the defendant knew that the note dated

October 13, 1897, delivered to the bank by another person for his benefit was a forged instrument. It is difficult to see how the fact that the Stuart and Gallagher notes were forgeries would throw any light on that question. The rule with respect to independent crimes is summed up by Earl, J., in People v. Shulman, 80 N. Y. 373, 376, as follows:

"But there is one general rule which must apply to all such cases; there must be, in the transactions thus sought to be proved, some relation to or connection with the main transaction; that is, they must show a common motive or intent running through all the transactions, or they must be such as in their nature show guilty knowledge at the time of the main transaction. And if they possess these characteristics, then it matters not whether they were before or after, or near to or remote from, the main transaction."

This is one of the cases cited as authority for the rule laid down in the People v. Everhardt, 104 N. Y. 591, 11 N. E. 62. It would seem that the issue involved in the present case was very like the issue in the People v. Weaver, 177 N. Y. 434, 69 N. E. 1094. There the single issue raised by the defendant was that there was no intent on her part to defraud and that she acted in good faith, and in the honest belief that she had a right to indorse another's name on the instrument which she was indicted for forging and uttering. Testimony that she had forged other instruments was held to have been improperly received. Ordinarily, forgery is proved by showing that the person charged wrote the instrument or the signature. In the Weaver Case the defendant did not deny writing the name, but did deny that she wrote it without authority, or with the intent to deceive or defraud. In the present case the issue was not that the defendant actually forged the instrument, but whether or not he knew it was forged and intended to defraud by uttering it. There was no more reason for saying that proof of other independent forgeries by him threw light upon his knowledge as to whether the note in question was actually forged, than there was in the Weaver Case for saying that other forgeries threw light upon the question as to whether the defendant in good faith believed she had the right to indorse the note with another's name. The defendant may be guilty of the crime charged, but that is no reason why his trial should not be conducted in accordance with the proper rules of law, or why he should be loaded down with a mass of immaterial evidence which could but prejudice him in the minds of the jury. Other errors are urged, but inasmuch as we deem those considered sufficient to call for a new trial, it is unnecessary to consider them.

For the foregoing reasons, I think the judgment of conviction should be reversed, and a new trial granted.

O'BRIEN, P. J., and LAUGHLIN, J., concur.

INGRAHAM, J. (dissenting). The defendant was convicted under the second count of an indictment which charged that he, "with intent to defraud, did feloniously utter, dispose of, and put off as true" a certain forged note set out in the indictment.

The defendant carried on business as a stonecutter, and had an account in the Twelfth Ward Bank, in the city of New York. From May to October, 1897, he had a large number of notes discounted by the

bank. The defendant having a contract for building a courthouse in Rensselaer county, and other contracts, the Twelfth Ward Bank made advances from time to time to enable him to carry on his operations. He had assigned to the bank the money he was to receive for building the courthouse as security for the advances made, the defendant testifying that the course of dealing between himself and the bank was that he would take his own notes to the bank, and leave them with it as security for advances; that the defendant made his notes payable to the order of himself, and the bank advanced to him money for his pay rolls, the defendant receiving back the notes when the bank received payments under the Rensselaer courthouse contract; that he also gave to the bank notes of other people payable to his order. The cashier of the Twelfth Ward Bank testified that the first time he saw the forged note in question was on October 13, 1897, when the defendant indorsed it in his presence; that this note was dated October 13, 1897, purported to be made by Thomas Cockerill & Son, payable to the order of the defendant in 30 days at the West Side Bank, and was indorsed by the defendant. It appeared that on May 13th or 14th of the same year the defendant presented to the bank a note which purported to be signed by Thomas Cockerill & Son for $2,500; that the defendant then said that he was doing work for Mr. Cockerill, and that he would like to get the money on the note then presented; that the note was discounted for the defendant, and became due on August 13, 1897; that on that day the defendant came to the bank, brought with him a note for $2,000, dated August 13, 1897, payable two months after date, and which purported to have been made by the same firm, and $521 in cash; that $500 was paid on account of the note for $2,500; the note for $2,000 was discounted, the $21 paying the discount; that on October 13, 1897, a Miss Fitzpatrick, an employé of the defendant, brought the note in question to the bank; there was attached to it a $10 bill for the discount; that she presented it to the bank, and said that the defendant could call later in the day and indorse it; and that the defendant called later on the same day, and said to the cashier that a note had been brought there by Miss Fitzpatrick for him to indorse, and the witness gave the defendant the note, who then indorsed it, and the note was discounted for the defendant, the proceeds being applied to the note of August 13th.

It being conceded that the note in question was forged, the question presented is whether the defendant uttered it knowing that it had been forged. There was no evidence in the case to show who actually forged the note in question. We think the evidence was amply sufficient to justify a conviction under the indictment. The defendant, however, claims that it was error to admit in evidence transactions relating to two notes purporting to have been made by James Stewart & Co. One indorsed by the defendant, and which he induced Isaac A. Hopper to have discounted for him; and the other purporting to be made by the same makers upon which he obtained a loan from Mr. John Hopper. This testimony in substance was that on the 29th day of July, 1897, the defendant called upon Isaac Hopper, and asked him if he could get a note discounted; that he then produced a note of James Stewart & Co. for $3,200 at 90 days; that this note was made to the order of the

defendant; that the defendant indorsed it and delivered it to Hopper, who took it to the Twenty-Third Ward Bank, indorsed it, and procured its discount by that bank, and turned the proceeds over to the defendant; that on August 9, 1897, the defendant came to John Hopper, a brother of Isaac A. Hopper, with a note for $3,299 purporting to be signed by James Stewart & Co. This note was dated July 27, 1897, and was payable to the order of the defendant three months after date. The defendant asked John Hopper to make him a loan upon that note, whereupon Hopper gave him $2,800; the note of Stewart & Co. being left with Hopper as security. There was then testimony that the note for $3,200 which Isaac A. Hopper had procured the Twenty-Third Ward Bank to discount had been sent to Buffalo for collection, when notice had been given to the bank that there was some irregularity with the signature, but that on October 23, 1897, the note was paid in New York to the Twenty-Third Ward Bank, and that bank then ordered the note returned from Buffalo. What subsequently became of the note does not appear. When the note for $3,200 given to John Hopper on August 9th came due, the defendant went to John Hopper, gave him a check for the amount that Hopper had loaned, and received back the Stewart note. On the following morning (October 19th) the defendant again saw John Hopper, and told him that the check was not good, that the note was a forgery, and that there was no use in presenting the check as the defendant had not the money to meet it. At that time the defendant said that if Hopper told anybody about the note being a forgery his family would be disgraced, and he felt like jumping off the dock. He (defendant) said that he had to do it, that he was in close quarters, and needed the money very bad; that he had a note for $3,200 that Mr. Isaac A. Hopper had indorsed and had discounted at the Twenty-Third Ward Bank, whereupon Hopper gave him a check for $3,200 to meet the note in the bank—the discount of which had been procured by Isaac A. Hopper. This evidence was all objected to by the defendant, the objection was overruled, and the defendant excepted.

In considering the advisability of this evidence we must keep in mind that the question for the jury to determine was whether, when the defendant presented this note for discount at the Twelfth Ward Bank, he knew that it was forged. That his employé presented the note for discount, that he indorsed it, that it was discounted by the bank for him, that he received the proceeds, and that the note was forged, is all conceded. Irrespective of this evidence as to the Stewart notes, the evidence was amply sufficient to justify the jury in finding that the defendant knew the note in question was forged. This was the third note of the same makers that had been discounted by the defendant at this bank which was forged. The first forged note was presented by the defendant for discount on May 13 or 14, 1897, and was for $2,500. When that note came due the defendant took a note for $2,000 to the bank purporting to have been made by the same makers, which was also forged, and obtained its discount; the proceeds being applied to take up the first forged note. When the second forged note came due the defendant presented another forged note of the same maker, which is the note in question, procured its discount, and with it took up the second

forged note. Assuming that it may have been possible that the defendant had been deceived as to one note, as there is no claim that either of these notes was obtained from the makers, and that the forgery must have been committed by somebody connected with the defendant, and solely for his benefit, it is improbable that all three notes could have been forged, discounted by the bank for the defendant, and provision made for their payment without presenting them to the makers, without a knowledge of the defendant as to their character. That he had extended his operations so as to procure the discount of notes of other persons which were forged, and his admission to those whom he had defrauded of the forgery of the notes, was undoubtedly important evidence in the minds of the jury of his guilty knowledge as to the note in question.

The rule that upon the trial of an indictment charging a specific crime evidence of other crimes is not admissible, has been recognized as one of the most beneficent rules of the common law preventing the conviction of a defendant because of his bad character, or because he had been guilty of crimes other than the crime for which he was being tried; but it has always been recognized that the mere fact that evidence would tend to prove the commission of another crime does not make it incompetent if it bears directly upon the guilt of the defendant of the crime for which he is being tried. The question always is whether the facts sought to be proved bear upon the guilt or innocence of the defendant of the crime for which he is being tried. This question is discussed in People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193. In that case the defendant was convicted of killing one Katharine J. Adams, and the question presented to the court was whether an attempt to kill one Barnet by the same means which were employed in the death of Mrs. Adams was competent for the purpose of proving his guilt of the crime of killing Mrs. Adams as charged in the indictment. The court recognizes the rule that it is not permitted to show the defendant's former character, or to prove his guilt of other crimes merely for the purpose of raising a presumption that he who would commit them would be more apt to commit the crime in question. The exceptions to this rule are then referred to, the court saying:

"The exceptions to the rule cannot be stated with categorical precision. Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme of plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial."

This does not purport to be a complete statement of cases in which evidence of a crime other than that charged in the indictment is competent, but it seems to me it would be more correct to say that evidence of a crime other than that charged in the indictment is never competent where it is offered solely to establish the bad character of the defendant or the commission of other crime. The evidence is competent when it tends to convict the defendant of the crime for which he is being tried. If it is competent upon that issue, then the mere fact that it tends to convict the defendant of another crime does not make it incompetent. If not competent evidence, as fairly tending to convict

the defendant of the crime charged in the indictment, it is not competent. The real principle involved is that evidence tending to convict the defendant of a crime other than that charged in the indictment is not competent when introduced merely to prove that the defendant is guilty of the other crime, as the common law does not admit that the bad character of the defendant or that he has committed crimes other than that charged in the indictment tends to prove that he committed the crime for which he is being tried.

In People v. Everhardt, 104 N. Y. 591, 11 N. E. 62, the competency of such evidence when the question is of the defendant's knowledge of the character of the forged instrument which he was charged with uttering was directly passed upon. Judge Earl, in delivering the opinion of the court in that case, said:

"Upon the trial the people were allowed to prove against the objection of the defendant the uttering of other forged checks by him upon other occasions. In this there was no error. The defendant by his plea of not guilty had put in issue everything which it was incumbent upon the people to prove. They had no direct or positive evidence that he personally forged the check which he uttered, and it was open for him to show that at the time he uttered it he had no knowledge that it was forged, and was therefore innocent of crime; and for the purpose of showing the prisoner's guilty knowledge in such cases it has always been held competent to prove other forgeries. * * * Such proof is not received for the purpose of showing other crimes than that charged in the indictment, but for the purpose of showing the guilty knowledge and intent which are elements of the crime charged, and it can be considered by the jury only for that purpose. Although the evidence of Gaylord, corroborated at it was, as to the guilty knowledge of the defendant, was quite clear and convincing, yet the people were not bound to rest upon prima facie case, but had the right to confirm that evidence by the proof as to the uttering of other forged checks."

In that case, as in the case now before us, the evidence was introduced to show knowledge of the defendant that the note that he procured to be discounted was forged, it seems to me to be controlling authority that evidence that at about the same time the defendant had uttered other forged instruments of the same character was competent evidence upon the question of guilty knowledge.

The defendant, however, claims that this case has been overruled by the case of People v. Weaver, 177 N. Y. 434, 69 N. E. 1094. The facts of that case are discussed in the opinion of Judge O'Brien, but his opinion was not adopted by the court, the majority of the court stating:

"As the facts in this case are sufficiently narrated in the opinions of Judges O'Brien and Werner, we think it necessary simply to state the various questions presented by this appeal, and our determination of the same without comment or discussion."

And it was then held that it was error to allow a witness to refer to the other notes alleged to be forged, but which did not purport to be indorsed by Davis. The issue in that case, however, was different from that presented in the case at bar; for in that case the defendant admitted forging the note and having it discounted, but alleged that she understood that she had authority from Davis, whose indorsement she forged. As to whether or not she actually had such authority, or whether she honestly and in good faith believed she had, was an entirely different question from that presented here, namely, whether a

note concededly forged was presented to the bank without knowledge of the fact that it was forged. Whether the defendant in the Weaver Case had or had not forged other notes was not material upon the question as to whether she actually had or supposed that she had authority to sign Davis' name as indorser of the note; but this case comes within the principle established in the Everhardt Case, where the question of guilty knowledge was presented, and I think that evidence that the defendant, about the same time that he uttered the forged note, for the utterance of which he is being tried, presented and procured the discount of other forged instruments which he admitted he knew were forged when he procured their discount, was competent. In Judge O'Brien's opinion the distinction is taken, for there he says:

"It is clear that upon the single issue raised by the defendant, namely, that there was no intent on her part to defraud; that she acted in good faith, and in the honest belief that she had a right to do what she did—this testimony as to the other indorsements must have greatly embarrassed the defendant upon the trial of the only issue in the case, and must have tended to prejudice and mislead the jury."

In the dissenting opinion of Judge Werner, after citing the Everhardt Case, he says:

"Intent is a state of mind, and that is a thing not provable by direct evidence. This is the reason for the rule that in all cases where the scienter or quo animo is requisite to and constitute a necessary and essential part of a crime with which a person is charged, and proof of guilty knowledge is indispensable to establish his guilt in regard to the transaction in question, testimony of such acts, conduct, or declarations of the accused as tend to establish such knowledge or intent is competent, notwithstanding they may constitute in law a distinct crime."

And from this statement of the rule, as I understand it, there was no dissent. I do not think, therefore, that it was error to admit the transactions in relation to the Stewart notes.

There is also another question relied upon by the defendant which related to the exclusion of his testimony in relation to the Cockerill notes. The defendant was called as a witness on his own behalf. He stated that he was not in New York on the 13th day of October, the day on which it was alleged he indorsed the note in question; that he was in Troy on October 11th, stayed in Troy until Wednesday 13th, and on that day went to his quarry and stayed there until the 15th, when he left for Boston, and arrived in New York late Saturday evening, October 16th; that the following Monday he went to the bank and indorsed three notes which had been left at the bank for discount to be indorsed by him when he returned, and among these three notes was the Cockerill note in question; that he first knew that the note was not what it purported to be on November 13th, when it became due; that he knew nothing about the $2,500 note purporting to be made by Cockerill, and which was discounted on May 13th; that he had no recollection of going to the bank on the 13th of August, and no recollection of the note for $2,000 which was discounted by the bank on that day. Upon cross-examination he stated that he would neither deny nor affirm that he indorsed the Cockerill note for $2,500, but he simply had no recollection of indorsing or discounting it; that when he indorsed the Cockerill note on October 18th he thought that his office

had received that note as a collection, and that it had been placed in the bank for discount; that some one in his employ had collected the note as a payment on account of money due from Cockerill to him, and had left it at the bank to be discounted.

Upon redirect examination he was asked whether the note in question which he was accused of having uttered was taken to the bank by his direction, and he said, "The note was taken to the bank by my direction." Subsequently he corrected that, and said that he did not know anything about the Cockerill note being taken to the bank; that October 18th was the first time he knew the note was there, that on November 13th when the note became due, he was informed by the president of the bank that there was an informality about it, and he returned to his office and had a conversation with Miss Fitzpatrick. He was then asked about his interview with Miss Fitzpatrick, with the president of the bank, and with Mr. Cockerill. These questions were objected to, and excluded; but this evidence was all incompetent. It would have been quite competent to prove that at the time he indorsed the note in question, or prior thereto, he had any conversation with Miss Fitzpatrick, or the defendant, or any one, as to the character of notes to show what knowledge he had at the time about the notes when they were discounted; but conversations with these people a month afterwards, when the note came due, had no relation to his knowledge on the 13th day of October, when it was shown by the people's testimony that he had indorsed the note. He was allowed to testify as to his relations to this note, and the other notes of Cockerill that were discounted for him by the Twelfth Ward Bank. He had testified that he had no knowledge of either of the Cockerill notes discounted prior to the one in question, and had no knowledge of this note until October 18th, when he indorsed it, and then supposed it was a collection from Cockerill given in payment of money that was due to him. He also testified that when he had this interview with Miss Fitzpatrick, after November 13th, when this note was due, it was the first knowledge or information that he had that this note was a forgery.

There were many other objections and exceptions taken by the defendant to rulings upon questions of evidence, but none of them require consideration; and my conclusion is that the evidence was amply sufficient to justify the verdict of the jury, and that no error was committed which would require us in reversing the judgment.

The judgment appealed from should be affirmed.

McLAUGHLIN, J., concurs.